**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DESI LEE HEWITT,**

       **Plaintiff,**

**vs.**                           **Case No. 4:08cv554-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded for further evidence.

**Procedural status of the case**

      Plaintiff, Desi Lee Hewitt, applied for supplemental security income benefits. Plaintiff was 46 years old at the time of the administrative hearing (on March 11, 2008), has a 10th grade education, and has past relevant work sewing machine operator. Plaintiff alleges disability due to severe headaches.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.  Does the individual have any impairments which prevent past relevant work?

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  <u>Chester</u>, 792 F.2d at 131; <u>MacGregor v. Bowen</u>, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  <u>Hale v.</u>

<u>Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified at the hearing on March 11, 2008, that she was then 47 years

old.  R. 346.  She said she last worked in 1991 as a sewing machine operator making

shirts.  R. 347.  She worked in that job for about 18 months.  *Id.*

Plaintiff testified that she cannot now work because of the pain medication she

takes.  R. 348.  She said her main problem causing an inability to work is constant

migraine headaches.  *Id.*  She said she also had numbness in her left side and lower

back pain.  *Id.*  She said that these "keep me sick, either in bed or on the couch."  *Id.*

Plaintiff said she could sit or stand 15 to 45 minutes at the most, and cannot sit or

stand longer due to her back pain.  R. 350.  She said she cannot walk a block.  *Id.*  She

said she could lift up to 10 pounds with her right hand, but can lift no weight in her left

hand due to lack of grip.  *Id.*

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

Plaintiff said that every day, she "nurses" her headache and, on a good day, cooked and cleaned. R. 351. She did not read or watch television much, and did not gardening, sewing, or hobbies. *Id.* Plaintiff had a valid driver's license. R. 352. She could shop for groceries if someone were with her. *Id.* She did not visit friends or go to church. *Id.* She smoked about one pack of cigarettes a day. *Id.* She was able to dress herself and attend to personal hygiene. *Id.*

Plaintiff said that her headaches started in 2003. R. 353. She had taken Lortab and Tylenol with codeine for the headaches. *Id.* She said that the headaches were accompanied by numbness on her left side, blurred vision, nausea, and vomiting. *Id.* She said she had reported these problems to her physicians. R. 354.

Plaintiff said that she had a headache every day. R. 354. Some were worse than others, and some were migraine headaches. *Id.* She said a headache would last from 30 minutes to one hour. *Id.* During the headache, Plaintiff said she could not concentrate. *Id.*

Plaintiff said she had no health insurance. R. 355. She used the county health department because she could not afford other care. *Id.* She sought an award of social security benefits to pay for her medications. R. 356.

The Administrative Law Judge called Edward Griffin, M.D., to testify by telephone based upon his review of Plaintiff's medical file. R. 323. The ALJ read to Dr. Griffin from the medical record. R. 324-327.

Dr. Griffin is a specialist in internal medicine. R. 327. Dr. Griffin had Plaintiff's medical records, but had not treated Plaintiff. R. 328. Dr. Griffin noted that she was examined on January 3, 2005, with a complaint of numbness of the left side of her body.

R. 328.  Except for complaints of numbness, the examination was normal and she had no atrophy.  R. 329.  An MRI of the brain was also normal.  *Id.*

Dr. Griffin noted that on June 22, 2005, Plaintiff complained of numbness of the entire left leg.  R. 329.  She had the same complaint on January 12, 2005.  *Id.*  On July 7, 2006, she said she was numb in that region associated with headaches, but the motor examination was normal.  *Id.*  The sensory examination reported diminished sensation in the arms and legs and the dorsal soles of the feet, but undiminished in the toes.  *Id.*  Dr. Griffin said he knew of no neurological issue that would cause that.  *Id.*

Dr. Griffin noted an angiogram of her carotid arteries, a nerve conduction study of her left arm and leg, and an MRI of her brain, all in January, 2007, the results of which were all normal.  R. 330.  He noted that the clinical neurological examination before the tests was normal.  *Id.*  Dr. Griffin said that the pinprick testing, that revealed "patchy deficits," was "highly subjective" as it only reported what the patient said she felt.  R. 331-332.  Dr. Griffin said that with respect to Plaintiff's report of left side numbness, there was no diagnosis and this did not meet a Listed impairment.  R. 332.

Dr. Griffin said that Plaintiff does have headaches "which are either migraine or tension.  She's had limited treatment."  R. 332.  He acknowledged later, however, that she had had "a number of visits" for treatment.  R. 340.  He also acknowledge that Plaintiff's history as given to her doctors would be consistent with someone who had either a migraine or a tension headache, and he noted that the headaches had been ongoing since 2004.  *Id.*

Dr. Griffin said that the January 12, 2005, examination showed normal results except for reflexes in Plaintiff's left leg, and he thought that the test for that had not been

properly done because there was no record that the testing physician had distracted Plaintiff while hitting her knee with the hammer. R. 336-337. He said that the MRIs and nerve conduction tests of the left upper and lower extremities all had normal results. R. 337. In summary, said Dr. Griffin, there was no diagnosis of any physical problem except for headaches, which could either be from muscle tension or migraine. *Id.*

Dr. Griffin was directed to a lumbar spine MRI done on June 29, 2004, showing a bulging disc, but he said that 36% of the population has a bulging disc. R. 339. He said that a bulging disc at L4 or L5 for a person in her mid forties "is not sufficient in and of itself." *Id.* He said that there was nothing else in Plaintiff's medical records to indicate that this was significant. *Id.*

Dr. Griffin was asked to comment on the residual functional capacity assessment of Dr. Hassan, Plaintiff's treating physician. R. 342. He said that there was nothing in the record to support Dr. Hassan's opinion. *Id.* He said: "She doesn't comment on frequency and headaches." *Id.* He did not recommend that the matter be clarified with Dr. Hassan because "the record is as it stands." *Id.* Dr. Griffin said that to determine the validity of Dr. Hassan's opinion, one would look at the treatment notes to see how often the headaches occurred and what side effects the patient had from medications. R. 343. He said that it looked like Dr. Hassan was "pulling it out of thin air." *Id.* He said that Dr. Hassan's residual functional capacity assessment was "not supported by the treatment notes." R. 345. He said: "The treatment notes would have to document frequency she gets these headaches, duration, some medication, [inaudible]." *Id.*

Dr. Griffin said that the "record doesn't support any partial limitation as it stands right now." R. 333. He thought that Plaintiff could lift and carry up to 50 pounds

occasionally, up to 25 to 30 pounds frequently. *Id.* He said that Plaintiff's ability to stand, walk, or sit was not affected, and she could stand, walk, or sit for 6 hours in an 8 hour day. *Id.* He said that Plaintiff had no limitation for climbing stairs, ladders, scaffolds, balancing, kneeling, crouching, crawling, stooping, reaching, handling, fingering, or feeling. R. 334. He said she had no environmental limitations. R. 335.

**Medical evidence**

The first medical record is dated June 3, 2003, when Plaintiff was seen by Gurprit Sekhon, M.D. R. 234. She complained of pain in her left shoulder and neck, and that her arm was numb. *Id.* She also complained of migraine headache. *Id.* She related a history of migraine headaches that had been getting worse. *Id.* She had no history of blurry vision, numbness, or weakness. *Id.* She smoked a pack of cigarettes a day. *Id.* The diagnosis was shoulder pain, possible arthritic cause or "frozen shoulder." *Id.*

On June 18, 2004, Plaintiff complained of an ovarian mass. R. 174. She was smoking half a pack of cigarettes a day. R. 175. She also complained of migraine headaches and numbness in her left arm. *Id.*

On June 22, 2004, Dr. Sekhon noted that Plaintiff said she had a lot of pain in her back. R. 195. She had been vomiting the night before. *Id.*

On June 29, 2004, Plaintiff had an MRI of her spine. R. 171. It was reported that she had a history of lumbago and leg pain for three weeks. *Id.* A "minimal" disc bulge was detected at L4-L5. *Id.* There was no evidence of disc space narrowing or dessication. R. 172. An abnormal cystic mass was also detected in Plaintiff's pelvis. *Id.* On July 23, 2004, Plaintiff requested medication for nausea. R. 195. On August 27,

2004, Plaintiff had a hysterectomy. R. 158. In the preoperative examination, Plaintiff reported having migraines. R. 162.

On October 7, 2004, Plaintiff complained of "N/V" (nausea and vomiting) every other night. R. 156. On November 15, 2004, Plaintiff saw Dr. Sekhon for chest pain on the left side and numbness in her hands for the past few days, with epigastric distress. R. 193. She said she had bad headaches. *Id.*

On January 3, 2005, Plaintiff was examined by Sam R. Banner, M.D., on a consultative basis for a disability determination. R. 149. Her chief complaint was numbness and tingling on her entire left side. *Id.* She also said she had difficulty grasping objects, lifting over 5 pounds with her left upper extremity, and said she had lumbar pain that had started in 2003. *Id.* There was no mention of headaches as a chief complaint. *Id.* A past history of migraine headaches was noted. *Id.* A smoking habit of one-half a pack per day for 29 years was also noted. *Id.* On examination, no muscle spasm was observed in her neck or back, and she had good range of motion in both. R. 150-151. She had no difficulty getting on the table or walking. R. 151. She had 4/5 strength in the left lower extremity, and 5/5 in all others. R. 152. Muscle tone was normal and there was no atrophy in any muscle group in the upper or lower extremities. *Id.* Her fine and gross motions in both hands was satisfactory. *Id.* She said she felt nothing to pinprick on her entire left lower extremity, and had patchy numbness on the left side of her face. *Id.* The diagnosis said Plaintiff had low back pain with left lower extremity numbness, but said nothing about headaches. *Id.*

On January 12, 2005, Plaintiff saw Dr. Sekhon complaining of numbness on the left side. R. 193. Dr. Sekhon found that her muscle strength was decreased in her left

hand, her finger tips were cold, and her muscle strength was 3/5 in her left arm and leg, but normal in other areas. *Id.* Dr. Sekhon referred her for an MRI of the brain. *Id.*

The brain MRI was conducted on January 18, 2005. R. 154. No abnormality was detected. *Id.*

On March 23, 2005, Plaintiff came to the health clinic of Dr. Sekhon asking for medications for heartburn and migraine headaches. R. 246. Prevacid[2] and Axert[3] were prescribed. R. 245.

On July 7, 2006, Plaintiff came to the clinic complaining of migraines with blurred vision, numbness on the left side of her neck, face, and arm, and swelling of her right knee. R. 245. On examination, it was observed that Plaintiff's motor strength was 5/5 (undiminished) in all extremities, her grip strength was 5/5, her gait was normal, and she had no muscle atrophy. *Id.*

On July 10, 2006, Plaintiff had an x-ray of her cervical and lumbar spine. R. 271-272. No defects or abnormalities were detected. *Id.*

On July 14, 2006, Plaintiff was seen at the emergency room of Doctor's Memorial Hospital in Bonifay, Florida, for headaches and numbness on the left side. R. 290.

---

[2] Prevacid NapraPAC is prescribed to relieve arthritis symptoms in people who also have a history of stomach ulcers, pain caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis (spinal arthritis). PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[3] Axert is a medication used to treat migraine attacks in adults. Axert belongs to a class of drugs called selective serotonin receptor agonists. Axert reduces the swelling of blood vessels that surround your brain. This swelling is associated with the headache pain of a migraine attack. Axert blocks the release of substances from nerve endings that cause more pain and other migraine symptoms, and it also interrupts the pain signals that are sent your brain. By doing all of these things, Axert helps to relieve the symptoms of your migraine. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff reported that she had had headaches for years, and the headaches had become worse over the last two weeks. *Id.* She reported that she had had an MRI that had revealed that she had had a light stroke, or a "TIA." *Id.* and R. 289. Fioricet[4] was prescribed. R. 290.

On July 24, 2006, Plaintiff returned to the clinic for a followup on lab work. R. 243. The assessment was headaches, nicotine abuse, and TIA. *Id.* It was noted that Plaintiff had an appointment with a neurologist in two weeks. *Id.*

On September 8, 2006, Plaintiff returned for a followup. R. 242. Migraine headache was noted as one of the assessments. *Id.*

On November 1, 2006, Plaintiff complained of a headache. R. 241. She had taken ibuprofen and it did not work. *Id.* Migraines were noted "by history." R. 240. Excedrin was prescribed. *Id.*

On December 11, 2006, Plaintiff said that Excedrin had not helped. R. 240. Motrin was prescribed. R. 239.

On December 29, 2006, Plaintiff was seen by Nurse Practitioner Stephanie Breland, who worked for Karin Maddox, M.D., at the Brain & Spine Center. R. 216-217. She had been referred for an evaluation of headaches and blurred vision. R. 217. Plaintiff reported that she smoked one pack of cigarettes a day. *Id.* Plaintiff complained of headaches, blurred vision, weakness and paresthesias of her left upper and lower

---

[4] Fioricet is a strong, non-narcotic pain reliever and relaxant, is prescribed for the relief of tension headache symptoms caused by muscle contractions in the head, neck, and shoulder area. It combines a sedative barbiturate (butalbital), a non-aspirin pain reliever (acetaminophen), and caffeine. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

extremity, low back pain, loss of strength, chills, sweats, and double vision. *Id.*

Decreased motor strength in the left extremities (3/5) was noted. R. 216. Her sensory

perceptions were intact to light touch and pin prick. *Id.* An MRI of the brain and an

MRA of the carotids were ordered. *Id.* Pamelor[5], Fioricet, and Toradol[6] were

prescribed. *Id.*

On February 6, 2007, Plaintiff was seen again at the Brain & Spine Center. R.

215. Nurse Practitioner Breland reported that the MRI of the brain, MRA of the brain,

and MRA of the carotids, were all normal. *Id.* The NCV[7] and EMG[8] tests were also

normal. *Id.* Plaintiff said she had had a bad headache the previous day that made her

sick. *Id.* She said the medication helped some. *Id.* On examination, Plaintiff's short

and long term memory were intact, she was alert and oriented, and she obeyed simple

and complex commands. *Id.* Her strength in all extremities was unimpaired (5/5). *Id.*

Her sensory perception was intact to light pin prick. *Id.* Plaintiff's walking was normal.

---

[5] Pamelor is an antidepressant. PHYSICIANS' DESK REFERENCE (1998), p. 1889.

[6] Toradol is a nonsteroidal anti-inflammatory (NSAID) drug. It is "indicated for short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level. It is NOT indicated for minor or chronic painful conditions." PHYSICIANS' DESK REFERENCE (2004), p. 2966.

[7] Nerve conduction velocity testing. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[8] Electromyogram. Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

*Id.* The assessment was low back pain and headaches. *Id.* Inderal[9] was prescribed. R. 214. She released Plaintiff back to her primary treating physician. *Id.*

On March 19, 2007, Plaintiff was seen again at the health clinic. R. 239. This was a "followup" for March 12, 2007, lab work. *Id.* "Migraine" was one of the assessments noted. R. 238.

On June 25, 2007, she returned to the clinic. R. 237. Plaintiff said that the neurologist "refused" to see her. *Id.* Migraine was again one of the assessments noted. *Id.*

On August 15, 2007, Plaintiff came to the clinic complaining of a headache and blurred vision. R. 237. On August 16, 2007, she said that she had had a severe headache and blurred vision two days earlier. R. 236. Migraine headache was the assessment, and Plaintiff was referred to an ophthalmologist. *Id.*

On what was probably September 6, 2007, Dr. Merfat Hassan, of the Holmes County Health Department, completed a form that was entitled "Migraine Headache Medical Source Statement of Ability to Do Work-Related Activities." R. 283. The date of signature is actually September 6, 2002, R. 284, but that appears to be an error since the form covers the period after July 7, 2006.[10] Dr. Hassan said that Plaintiff's first visit

---

[9] Inderal, a type of medication known as a beta blocker, is used in the treatment of high blood pressure, angina pectoris (chest pain, usually caused by lack of oxygen to the heart due to clogged arteries), changes in heart rhythm, prevention of migraine headache, hereditary tremors, hypertrophic subaortic stenosis (a condition related to exertional angina), and tumors of the adrenal gland. It is also used to reduce the risk of death from recurring heart attack. PDRhealth™, Physicians Desktop Reference.

[10] There is a note that appears to be dated "3/19/02," but that is followed by a note dated "5/17/07," so it may be that Dr. Hassan's "7" sometimes looks like a "2." R. 238.

was July 7, 2006, and she was still being treated there. *Id.* He said that Plaintiff had throbbing head pain that worsened with physical activity. *Id.* He said that the pain interfered with regular activities, and was accompanied by nausea with vomiting. *Id.* He said that Plaintiff was sensitive to light (photophobia), experienced flickering lights, spots, and lines, had loss of appetite during a migraine, and was irritable and depressed. *Id.* Dr. Hassan said that Plaintiff experienced muscle aches and rebound headaches as side effects of her medications, but that she had had improvement with medications. *Id.* Dr. Hassan said that Plaintiff's ability to maintain attention, concentration, and pace under work conditions would be affected by her headaches. R. 284. He said that Plaintiff's attention would be affected during a migraine attack according to Plaintiff. *Id.* He thought that Plaintiff would need to take unscheduled breaks from work due to headaches two or three times a week, and during such breaks, would need to lie down. *Id.* He said that Plaintiff would be absent from work three or more days per month due to headaches. *Id.* He concluded: "[Patient] is saying that she have been [sic] having Migraines & was diagnosed with Migraine Headaches since she was 17 years." *Id.*

On September 25, 2007, Plaintiff saw Mohammad Yunus, M.D. R. 314. She said she had been experiencing severe and increasing headaches in the occipital region and the top of her head. *Id.* She reported to Dr. Yunus that "symptoms appear to be daily and progressively getting worse for the past 4 to 5 years and precipitated by no know factors." *Id.* She said she had had nausea, vomiting, visual disturbances, flashing lights, blurred vision, and photophobia with the headaches. *Id.* She had tried several medications and her response to this therapy was inadequate. *Id.* She said

she gets weakness in her left arm and leg, and some numbness in her left side. *Id.*
She said that Dr. Maddox, the neurologist, had prescribed Imitrex, but she could not
afford it. *Id.* During the neurological examination, Plaintiff had relative weakness in her
left hand grip. *Id.* The diagnosis was migraine, unspecified, and tension headache. *Id.*

On October 1, 2007, Plaintiff returned to the clinic for lab followup and reported
she was having bad headaches. R. 312. The physician thought that she might be
experiencing rebound headaches as a result of overuse of medications. *Id.*

On December 4, 2007, Plaintiff came again to the clinic complaining of
headaches and a knot under her right arm that she found the week prior. R. 310.

On January 16, 2008, Plaintiff returned to the clinic complaining of migraine
headaches. R. 309.

**Legal analysis**

### Whether the ALJ erred finding at step 2 that Plaintiff does not have the "severe" impairment of migraine headaches

Plaintiff first contends that the ALJ erred in not finding that her headaches were a
"severe" impairment at step 2. Doc. 18, p. 9. Plaintiff argues that Plaintiff's headaches
"should have been considered in the remainder of the sequential evaluation."

At step 2, the ALJ determined that Plaintiff had a "severe" impairment of
headaches. R. 18. In other words, he did find that Plaintiff had headaches, though
there was no evidence of a "certain determinable medical cause."[11] *Id.* He then
considered the claim of disabling headaches in the remainder of the sequential

---

[11] A physician is plainly competent to observe and testify to the existence of an
impairment even though the physician cannot ascertain the medical cause. <u>Windus v.
Barnhart</u>, 345 F. Supp. 2d 928, 944 (E.D. Wis. 2004).

evaluation, finding that the headaches were not sufficiently severe or frequent to be disabling.  R. 21-24.  This argument, therefore, is not persuasive.

**Whether the ALJ erroneously rejected the opinion of the treating physician, Dr. Hassan**

Plaintiff contends that the ALJ failed to give substantial weight to the opinion of Dr. Hassan, and failed to articulate reasons supported by substantial evidence for his rejection of that opinion.  Doc. 18, p. 12.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  357 F.3d at 1240-1241; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

The Administrative Law Judge declined to give substantial weight to the opinion of Dr. Hassan, reasoning that Dr. Griffin "was unable to identify any medical findings which would support Dr. Hassan's conclusion."  R. 23.  He further said:  "The claimant has undergone extensive diagnostic work-up, and if the claimant were as limited as Dr. Hassan's conclusions suggest, then the Administrative Law Judge would expect to see

some evidence of an objective medical abnormality." *Id.* The ALJ said that his review

of the progress notes from Dr. Hassan contained only Plaintiff's self-reported symptoms.

R. 24. The ALJ concluded that Dr. Hassan "based his MSS conclusions on nothing

more than the claimant's subjective allegations." *Id.* The ALJ concluded that he would

not give substantial weight to Dr. Hassan's opinion because it was "unaccompanied by

objective medical evidence and is wholly conclusory." *Id.*

It is true that objective testing (MRI, EMG, NCV, x-rays) failed to find an organic

abnormality that might cause Plaintiff's headaches, but this is of no importance. Dr.

Griffin admitted that Plaintiff's own subjective history to her physicians would be

consistent with someone who had either a migraine or a tension headache. R. 340.

The cases recognize this medical truth. "There appears to be no set standard for

establishing the existence of migraines." Creel v. Wachovia Corp., 2009 WL 179584, *8

n. 20 (11th Cir. Jan 27, 2009) (not selected for publication in the Federal Reporter, No.

08-10961);

> While it is true that Dr. Trueba did not cite to any laboratory tests
> confirming the existence or the severity of Ms. Ortega's migraine
> headaches, she did set forth the medical signs and symptoms sufficient to
> justify the diagnosis and treatment of migraine headaches. Included
> among the signs and symptoms suffered by the Plaintiff are nausea,
> vomiting, photophobia, dizzy spells, and black outs. (R. 152). Many of
> these symptoms are, in fact, medical signs which are associated with
> severe migraine headaches. Since present-day laboratory tests cannot
> prove the existence of migraine headaches, as is also the case with many
> psychiatric and psychological impairments, these medical signs are often
> the only means available to prove their existence. *Sisco v. U.S. Dept. of
> Health and Human Services*, 10 F.3d 739, 744 (10th Cir.1993) (noting
> there was no "dipstick" laboratory test to confirm the existence of Chronic
> Fatigue Syndrome the Court found the ALJ erred by relying upon plaintiff's
> failure to have such a test administered and thus, denying disability). The
> signs often begin as symptoms which, when analyzed by a physician or
> psychologist, can point out identifiable elements of a specific impairment.

> In the present case, nausea and vomiting were the medical signs
> analyzed to determine the existence of migraine headaches.

Ortega v. Chater, 933 F.Supp. 1071, 1075 (S.D. Fla. 1996).  *Accord*, Duncan v. Astrue,

2008 WL 111158 (E.D. N.C. Jan 08, 2008) (No. 4:06-CV-230-FL) ("there are some

conditions, such as migraine headaches, that cannot be diagnosed or confirmed

through laboratory or diagnostic testing"); Diaz v. Barnhart, 2002 WL 32345945, * (E.D.

Pa. Mar 07, 2002) (No. CIV.A. 01-CV-0525) ("Migraine headaches . . . 'do not stem from

a physical or chemical abnormality which can be detected by imaging techniques or

laboratory tests, but are linked to disturbances in cranial blood flow.' *Federman v.*

*Chater*, 95 Civ. 2892, 1996 U.S. Dist. LEXIS 2893, at *4 (S.D. N.Y. Mar. 7, 1996).").

Therefore, the lack of objective medical test results confirming an organic cause of

Plaintiff's migraine or tension headaches, and the fact that Dr. Hassan had only

Plaintiff's subjective report of symptoms upon which to base his assessment, is not an

adequate reason to disregard Dr. Hassan's opinion.

Another reason for not giving Dr. Hassan's opinion substantial weight articulated

by the ALJ was the observation that Plaintiff had filed two disability reports and neither

mentioned Dr. Hassan as a treating source.  R. 24.  The ALJ concluded, therefore, that

Plaintiff had only recently seen Dr. Hassan.  *Id.*

Plaintiff submitted a "Disability Report" on November 29, 2004, and she did not

mention Dr. Hassan as a treating source.  R. 115-117 (Exhibit 5E).  In that report, she

said she could not work due to an ulcer, heart problems, and a numb left arm.  R. 113.

She did not mention headaches.  She filed a "Disability Report-Appeal" on August 17,

2005, and again did not mention Dr. Hassan.  R. 128A (Exhibit 7E).  She did mention

"more headaches" and blurred vision. R. 128. These exhibits confirm the ALJ's conclusion that by August 17, 2005, Plaintiff had not been treated by Dr. Hassan, and that she had only recently seen Dr. Hassan.

This, however, is not a reason to discount Dr. Hassan. He and his clinic staff saw Plaintiff for about 14 months before he rendered his opinion, beginning on July 7, 2006, to the date of the opinion, September 6, 2007. Fourteen months is long enough to develop a treating relationship with a patient sufficient to express an opinion entitled to substantial weight. Further, Plaintiff complained of having a current or recent headache on fourteen occasions, and sought treatment for those recent headaches on June 3, 2003 (R. 234), June 18, 2004 (R. 175), October 7, 2004 (R. 193), March 23, 2005 (R. 246), July 7, 2006 (R. 245), July 14, 2006 (R. 290), November 1, 2006 (R. 241), December 29, 2006 (R. 217), February 6, 2007 (R. 215), August 15, 2007 (R. 237), September 25, 2007 (R. 314), October 1, 2007 (R. 312), December 4, 2007 (R. 310), and January 16, 2008 (R. 309). Plaintiff was prescribed a number of medications for her headaches, and she was repeatedly referred for objective testing to try to determine a medical cause for her headaches. While the ALJ and Dr. Griffin concluded that the record contained "very little evidence of medical treatment," R. 18, this determination is not supported by substantial evidence in the record.

Finally, the ALJ said that "there is nothing in the record which supports Dr. Hassan's opinion that the claimant would miss three or more days of work per month." R. 23. Repeating Dr. Griffin's testimony, the ALJ said that Dr. Hassan "just pulled this conclusion out of the air." *Id.* The ALJ said that Dr. Hassan speculated about the frequency and severity of Plaintiff's headaches, relying solely upon her own descriptions

of her symptoms. *Id.* He also said: "Dr. Hassan offered no reasonable explanation as to why the claimant's headaches could not be controlled by either medication or lifestyle changes." *Id.*

These are compelling reasons to question Dr. Hassan's assessment. In the passage above, I attempted to describe all of the relevant notations in the medical records. While evidence of the frequency, severity, and disabling characteristics of Plaintiff's headaches is likely to be available only from Plaintiff herself, the medical record does not even contain narratives about frequency and severity. The medical record does reflect, however, that Plaintiff was nauseous, vomited, and had blurred vision on occasion, but the frequency of those potentially disabling symptoms was not noted. The medical record contains no description of Plaintiff's daily activities and the effect upon those activities of headaches. The medical record does not contain any analysis of the success of the medications that were prescribed, and except to speculate that Plaintiff's headaches may have been exacerbated by cessation of medications (the "rebound" effect), there is no comment about side effects of medications.

In summary, as to this last issue, the medical records show precisely the kinds of signs that are to be expected when someone suffers frequent headaches. The record also shows many treatment attempts, but the records are ambiguous as to the frequency and severity of Plaintiff's headaches and whether other forms of treatment would be effective. Where there is an ambiguity in the treating physician's records or opinion, the Administrative Law Judge should take steps to clarify it:

Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). The Commissioner's regulations provide that if "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled,"

[w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available. *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.* 20 C.F.R. § 404.1512(e)(1), (emphasis added).

Johnson v. Barnhart, 138 Fed.Appx. 266, 271 (11th Cir. 2005). *See also*, Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")).

The ALJ in this case was able to obtain evidence from Dr. Griffin by means of the telephone. Perhaps that same technique could be used to obtain further evidence from Dr. Hassan or Plaintiff's current treating physician, or some other method might be used. In any event, the case should be remanded for these purposes.

**Whether the ALJ erred in finding Plaintiff to be not entirely credible**

Plaintiff also argues that the ALJ erred in finding her testimony to be not credible. Doc. 18, pp. 13-14. The central issue is the weight to be given to Dr. Hassan's opinion. If his opinion is to be given substantial weight, Plaintiff's credibility will be affirmed. The court should not reach this issue as remand is needed to explore Dr. Hassan's opinion.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and were not based upon substantial evidence in the record. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and the case be remanded to obtain further evidence from Dr. Hassan and, if appropriate, from Plaintiff's current treating physician.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED** for the purposes set forth above.

**IN CHAMBERS** at Tallahassee, Florida, on September 17, 2009.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:08cv554-MP/WCS